IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DALE CORPORATION | : | CIVIL ACTION |
| | : | NO. 09-1115 |
| v. | : | |
| | : | |
| CUMBERLAND MUTUAL FIRE | : | |
| INSURANCE COMPANY | : | |

O'NEILL, J.                                                    JUNE 30, 2010

## MEMORANDUM

Plaintiff Dale Corporation filed a declaratory judgment action against defendant Cumberland Mutual Fire Insurance Company with respect to two underlying suits filed by Robert Francis in the Philadelphia County Court of Common Pleas.  Dale seeks declarations that under an insurance policy issued by Cumberland to Nesmith & Co., Inc., Cumberland had a duty to defend and an obligation to indemnify Dale for settlement and defense costs incurred by or on behalf of Dale as a result of the underlying Francis suits.  Both parties have moved for summary judgment and their motions have been fully briefed.

## BACKGROUND[1]

Dale Corporation was hired by Westrum Development Co. as a construction manager for the Brewerytown construction project at 31st and Thompson Streets in Philadelphia.  Dale retained Nesmith as a subcontractor to perform construction services and provide related materials.  Dale also retained Chisom Electrical Contractors, Inc. to install an electrical cable for security lighting at the construction site.

The Dale/Nesmith subcontract required Nesmith to add Dale as an additional insured on Nesmith's Comprehensive General Liability Insurance policy.  Nesmith obtained an insurance

---

[1]        The following facts are undisputed by the parties.

policy from Cumberland for the period of May 1, 2005 to May 1, 2006 with a limit of $1,000,000

for each occurrence and a $2,000,000 general aggregate limit.  The policy provides coverage for

an additional insured which is defined as:

> any person or organization for whom you [Nesmith] are performing
> operations when you and such person or organization have agreed in
> writing in a contract or agreement that such person or organization be
> added as an additional insured on your policy.  Such person or
> organization is an additional insured only with respect to liability for
> "bodily injury", "property damage" or "personal and advertising
> injury" caused, in whole or in part, by:
>
> 1.  Your [Nesmith's] acts or omissions; or
> 2.  The acts or omissions of those acting on your [Nesmith's] behalf;
> in the performance of your [Nesmith's] ongoing operations for the
> additional insured.
>
> A person's or organization's status as an additional insured under this
> endorsement ends when your [Nesmith's] operations for that
> additional insured are completed.

An additional insured is entitled to certain coverage under the policy.  Specifically,

"[Cumberland] will pay those sums that the [additional] insured becomes legally obligated to pay

as damages because of 'bodily injury' or 'property damage' to which this insurance applies.

[Cumberland] will have the right and duty to defend the [additional] insured against any 'suit'

seeking those damages."

Along with the additional insured provision, the Dale/Nesmith subcontract also required

Nesmith to defend and indemnify Dale from claims "arising out of or resulting from performance

of [Nesmith]'s Work under this Subcontract, provided that any such claim, damage, loss or

expense is attributable to bodily injury . . . but only to the extent caused by the negligent acts or

omissions of [Nesmith] . . . or anyone for whose acts they may be liable."  The subcontract

required Nesmith to "take reasonable safety precautions with respect to performance" of the subcontract.

Nesmith rented a Genie lift and brought it to the construction site solely for its use in performing its duties on the site. John Russell, Nesmith's foreman for the carpenters at the site, testified that the Genie lift at that site "was solely for Nesmith" and that other than he and the carpenters no other trade used the lift. Joint Stip. (D. 24) Ex. O (Dep. J. Russell) at 21-22.

On June 21, 2005, however, Robert Francis, who was employed as an electrician by Chisom Electrical, was operating the Genie lift at the construction site under the supervision of his foreman, Alton Ming. Francis and Ming were using the lift to hang temporary electrical lines on three PECO power poles. The lift was used by Francis and Ming without Nesmith's permission or knowledge. While Ming was using the lift to install the third eye bolt on the power pole, Francis sustained a high-voltage electrical shock as a result of working in close proximity to an uninsulated energized overhead power line. He suffered severe burns.

Subsequently, Francis filed two lawsuits in the Philadelphia County Court of Common Pleas. The first suit, filed August 29, 2006, named Dale, among others, as a defendant. On April 17, 2007, Dale filed a joinder complaint against Nesmith seeking common law contribution, common law indemnification, contractual indemnification, counsel fees, costs and insurance coverage. Thereafter, on June 20, 2007, Francis filed a second suit naming Nesmith, among others, as a defendant. In the second suit, Francis levied a charge of negligence against Nesmith alone averring that Nesmith failed to secure the lift and keys and take other reasonable precautions which would have prevented Francis' injuries. On September 27, 2007 the two suits were consolidated.

The parties attempted to mediate the dispute. The first mediation took place on October 16, 2008 and did not result in a settlement. On October 31, 2008 and November 4, 2008, Dale tendered its defense to Nesmith and Cumberland in the underlying litigation. Cumberland denied the request on November 11, 2008. Subsequently, a second mediation took place on March 17, 2009. Nesmith offered $10,000 towards Francis' initial $7 million demand. The underlying litigation ultimately settled for $2 million. Neither Cumberland nor Nesmith contributed any sum towards the $2 million settlement amount.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment has the burden of demonstrating that there are no genuine issues of material fact. Id. at 322-23. If the moving party sustains the burden, the nonmoving party must set forth facts demonstrating the existence of a genuine issue for trial. See Anderson, 477 U.S. at 255.

When a properly supported motion for summary judgment is made, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse

party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts

showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The adverse party must

raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary

judgment motion and cannot survive by relying on unsupported assertions, conclusory

allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir.

1989). However, the "existence of disputed issues of material fact should be ascertained by

resolving all inferences, doubts and issues of credibility against" the moving party. Ely v. Hall's

Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

## DISCUSSION

Dale moves for summary judgment seeking declarations that: 1) it is an additional insured

under the Nesmith insurance policy; 2) its settlement in the underlying litigation was reasonable;

3) Cumberland had a duty to defend Dale in the underlying litigation; 4) Cumberland had a duty

to indemnify Dale in the underlying litigation; and 5) Dale is entitled to be reimbursed for

settlement costs and defense costs incurred by or on behalf of Dale in the underlying litigation.

Conversely, Cumberland moves for summary judgment seeking a declaration that it owed no

duty to defend or indemnify Dale. I will address each question in turn.

### A. Dale Was An Additional Insured Under the Policy

I will grant Dale's motion seeking a declaration that it was an "additional insured" under

the policy as unopposed because Cumberland does not dispute that Dale was an additional

insured. As discussed infra, however, Cumberland disputes that its duty to defend or indemnify

was triggered by the underlying litigation.

**B.      Cumberland's Duty to Defend**

An insurer's duty to defend is triggered if the allegations in the underlying complaint state at least "one cause of action [which] may potentially fall within the scope of [the policy's] coverage . . . ." Augenblick v. Nationwide Ins. Co., 1999 U.S. Dist. LEXIS 16183, No. 99-3419, at *6 (E.D. Pa. Oct. 8, 1999); see also Air Prods. & Chems. v. Hartford Accident & Indem. Co., 25 F.3d 177, 179 (3d Cir. 1994) ("Under Pennsylvania law, the issuer of a general liability insurance policy has a duty to defend its insured when the allegations in the complaint against it could potentially fall within the coverage of the policy.").

"In order to determine whether a claim may potentially come within the coverage of the policy, [I] must first ascertain the scope of the insurance coverage and then analyze the allegations in the complaint." Britamco Underwriters, Inc. v. Grzeskiewicz, 639 A.2d 1208, 1210 (Pa. Super. Ct. 1994) (citations and quotation marks omitted); see also Erie Insurance Exchange v. Claypoole, 673 A.2d 348, 355 (Pa. Super. Ct. 1996) (in a declaratory judgment action, "the allegations raised in the underlying complaint alone fix the insurer's duty to defend."). I may look to the underlying factual allegations and not just the particular cause of action pleaded to determine the extent of coverage. See Mutual Benefit Ins. Co. v. Haver, 725 A.2d 743, 745 (Pa. 1999)

"This duty to defend, however, is not activated by every allegation raised against the insured . . . . [O]nly allegations contained within the underlying complaint pertaining to injuries which are either actually or potentially within the scope of the insurance policy obligate the insurer to defend the insured." Erie Ins. Exchange, 673 A.2d at 355-356 (citing Aetna Cas. and Sur. Co. v. Roe, 650 A.2d 94, 98-99 (Pa. Super. Ct. 1994); see also Gen. Accident Ins. Co. of

6

America v. Allen, 692 A.2d 1089, 1095 (Pa. 1997) (citations omitted) ("If the complaint against the insured avers facts that would support a recovery covered by the policy, then coverage is triggered and the insurer has a duty to defend until such time that the claim is confined to a recovery that the policy does not cover.").  Furthermore, "[t]he duty to defend remains with the insurer until the insurer can confine the claim to a recovery that is not within the scope of the policy."  Pac. Indemnity Co. v. Linn, 766 F.2d 754, 760 (3d Cir. 1985) (internal citations omitted).

### 1.      "Caused In Whole Or In Part By"

First, I must examine the scope of the policy language because Dale was entitled to a defense from Cumberland only if the allegations contained within Francis' complaints pertain to injuries that are either actually or potentially within the scope of the insurance policy.  The additional insured endorsement states, in relevant part, that Dale

> is an additional insured only with respect to liability for 'bodily injury' . . . caused, in whole or in part, by: 1. Your [Nesmith's] acts or omissions; or 2.  The acts or omissions of those acting on your [Nesmith's] behalf [] in the performance of your [Nesmith's] ongoing operations for the additional insured [Dale].

In order to determine the scope of the policy, I must decide what it means for a bodily injury to be "caused, in whole or in part, by" Nesmith's acts or omissions.

"The interpretation of an insurance contract regarding the existence or non-existence of coverage is 'generally performed by the court.'"  Minnesota Fire & Cas. Co. v. Greenfield, 855 A.2d 854, 861 (Pa. 2004) (quoting Gen. Accident Ins. Co. of Am., 692 A.2d at 1093).  The Court's "purpose in interpreting insurance contracts is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy."  Donegal Mut. Ins. Co. v.

Baumhammers, 938 A.2d 286, 290 (Pa. 2007) (citing 401 Fourth Street, Inc. v. Investors Ins.

Group, 879 A.2d 166, 171 (Pa. 2005)). "[W]hen a provision in the policy is ambiguous, the

policy is to be construed in favor of the insured to further the contract's prime purpose of

indemnification and against the insurer, as the insurer drafts the policy and controls coverage."

Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 908 A.2d 888, 897

(Pa. 2006). However, "[w]hen the language of the policy is clear and unambiguous, we must

give effect to that language." Id. "Words of 'common usage' in an insurance policy are to be

construed in their natural, plain, and ordinary sense, and a court may inform its understanding of

these terms by considering their dictionary definitions." Wall Rose Mut. Ins. Co. v. Manross,

939 A.2d 958, 962 (Pa. Super. Ct. 2007).

Dale and Cumberland take different approaches to interpreting this policy language and

reach opposite conclusions as to what the language means. Essentially, Dale contends that

"caused, in whole or in part, by" means that Nesmith's acts or omissions need only have been the

"but for" cause of Francis' injuries. On the other hand, Cumberland contends that Nesmith's acts

or omissions had to be the proximate cause of his injuries in order to trigger Cumberland's duty

to defend.

Dale asks me first to consult Black's Law Dictionary which defines "cause" as "to bring

about or effect." Dale then makes a leap to conclude that "the term 'caused by' is analogous to

'the result of' and 'arising out of' phrases in that it simply implies that an activity or omission

brings about a result but does not rise to the level of proximate cause." Pl.'s Memo. (D. 25) at 10

(analogizing to Maryland Cas. Co. v. Regis Ins. Co., Civ. A. No. 96-790, 1997 U.S. Dist. LEXIS

4359 (E.D. Pa. Apr. 1, 1997) (holding that the phrase "as a result of" contained in an additional

insured provision only required a showing of "but for" causation)).[2]  Pennsylvania courts have

uniformly held phrases like "arising out of" to require only a showing of "but for" causation.  Id.

at 12-13 (citing R.R. Donnelly & Sons Co. v. Fireman's Fund Ins. Co., Civ. A. No. 03-6412,

2004 U.S. Dist. LEXIS 24583 (E.D. Pa. Dec. 6, 2004); Rust Eng'g & Constr. v. J.C. Zampell

Constr., Civ. A. No. 96-8706, 1997 U.S. Dist. LEXIS 19783 (E.D. Pa. Dec. 11, 1997)).

     For its part, Cumberland does not dispute that "arising out of" is a broad phrase requiring

only a "but for" showing.  Cumberland argues, however, that "caused by" is not analogous to

phrases like "arising out of" and, instead, "caused by" is a narrower standard.  Def.'s Mot. (D.

23) at 4 (citing Utica Nat'l Ins. Co. of Texas v. Am. Indem. Co., 141 S.W.3d 198, 203 (Tex.

2004) ("'[a]rising out of' are words of much broader significance than 'caused by.'") (quoting

Red Ball Motor Freight, Inc. v. Employers Mut. Liab. Ins. Co., 189 F.2d 374, 378 (5th Cir.

1951)); see also Def.'s Resp. (D. 30) at 4 (citing O'Dwyer v. Manchester Ins. Co., 303 So. 2d

347, 348 (Fla. Dist. Ct. App. 1974) ("'arising out of' is not synonymous with the words 'caused

by,' but is given a broader meaning in determining whether coverage applies.").  Cumberland

reasons that if "arising out of" requires only "but for" causation, then a narrower term such as

"caused by" must signify a closer causal relationship, i.e. proximate causation.  Def.'s Resp. (D.

---

[2]     Dale also points to cases where Courts in this jurisdiction determined that narrow
insurance policy language–such as "direct cause of a loss," "resulting directly from" and "direct
physical loss of . . . caused by or resulting from"–required proximate cause and not "but for"
causation.  Id. at 10-11 (citing Jefferson Bank v. Progressive Cas. Ins. Co., 965 F.2d 1274 (3d
Cir. 1992); Resolution Trust Corp. v. Fidelity & Deposit Co. of Maryland, 205 F.3d 615, 655 (3d
Cir. 2000) and Cher-D, Inc. v. Great Am. Alliance Ins. Co., Civ. A. No. 05-5936, 2009 U.S. Dist.
LEXIS 30206 (E.D. Pa. Apr. 7, 2009).  Dale distinguishes the present facts from these cases by
noting that the policy language does not require Nesmith's acts or omissions to be a "direct"
cause of bodily injury and if Cumberland so intended that result it could have written it into the
policy.

30) at 4-5 (citing Gulginiti v. Tocco, 462 F.2d 654 (3d Cir. 1972) (interpreting the term "caused by" in the Restatement (Second) of Torts § 339, infant trespasser rule, to require proximate causation); Cichon v. Brista Real Estate Assoc., 597 N.Y.S.2d 819, 821 (N.Y. App. Div. 1993); Edwards v. Int'l Bus. Machines Corp., 571 N.Y.S.2d 155 (N.Y. App. Div. 1991)).

The interpretation of this phrase in this additional insured endorsement seems to be an issue of first impression under Pennsylvania law. The additional insured endorsement found in the policy issued by Cumberland to Nesmith is an Insurance Services Office, Inc.[3] document, numbered CG 20 33 07 04 and copyrighted in 2004. In 2004, the ISO introduced this revised version of its widely used additional insured endorsements as a response to courts' interpretations of its prior version. 4 Philip L. Bruner & Patrick J. O'Connor, Jr., Bruner and O'Connor on Construction Law § 11:167 (2010).

> The 2004 revisions (1) eliminated the 'arising out of language' from several standard endorsements; (2) substituted, in its stead, that coverage applied only to injury or damage 'caused in whole or in part' by the acts [or] omissions of the named insured; and (3) specifically excluded injury or damage arising out of the sole negligence of the additional insured.

> The 2004 revisions are a belated acknowledgement [sic] that the 'arising out of' language simply did not accomplish the scope of coverage intended by the industry. Many courts interpreted 'arising out of' to be a simple causation test and, therefore, afforded direct primary coverage to the additional insured. The ISO hopes that, by substituting 'caused by' for 'arising out of,' a narrower coverage interpretation will be afforded. Moreover, the revised language specifies that coverage is afforded the additional insured for liability

---

[3] "The insurance industry operates by using standard policy forms. The provider of most of the standard forms is the Insurance Services Office, Inc. (ISO). This is an industry-supported organization. One of the primary missions of the ISO is to develop certain standard insurance policies." 4 Philip L. Bruner & Patrick J. O'Connor, Jr., Bruner and O'Connor on Construction Law § 11:6 (2010).

> arising out of the named insured's 'acts or omissions,' not simply the named insured's operations. Arguably, the absence of fault on behalf of the named insured results in a finding of no coverage for the additional insured.

Id. (footnotes omitted); see also id. at § 11:151 (noting that the industry sought to limit coverage of additional insureds by introduction of the "caused, in whole or in part, by" language which it hoped would require "some causation on the part of the named insured to trigger coverage under the additional insured endorsement."). This history significantly undercuts Dale's argument that a simple "but for" test is what was intended when the parties chose to use the words "caused by" rather than "arising out of."

In addition to this commentary on the 2004 ISO additional insured endorsement, other courts have interpreted this policy language. In Am. Empire Surplus Lines Ins. Co. v. Crum & Forster Specialty Ins. Co., Civ. A. No. 06-4, 2006 WL 1441854 (S.D. Tex. May 23, 2006), the District Court examined facts similar to those present here. Finger was the general contractor on a residential construction project and subcontracted with Multi Building, Inc. to perform framing work. Under the subcontract, Multi was to name Finger as an additional insured on Multi's commercial general liability insurance policy. Multi's policy was issued by defendant Crum. That policy contained virtually the same language pertaining to additional insureds as the Cumberland policy: an organization is only an additional insured "with respect to liability for 'bodily injury' . . . caused, in whole or in part, by: (1) Your [Multi's] acts or omissions; or (2) The acts or omissions of those acting on your [Multi's] behalf; in the performance of the ongoing operations for the additional insured at the location(s) designated above."

While working on the construction site, Jose Romero and Angel Martinez fell from a

makeshift aerial lift consisting of a forklift outfitted with a "trash box."[4]  As a result, Romero died and Martinez was injured.  Romero's spouse and children filed a suit in which Martinez intervened.  The first amended complaint alleged that Finger "and/or" Multi were negligent in causing Romero's death by: 1) supplying and designing an unsafe aerial lift consisting of a trash box affixed to a forklift; 2) controlling Romero's unsafe use of the makeshift aerial lift; and 3) directing Romero's work in an unsafe manner.  Id. at *7 n. 15.  It also alleged that these acts or omissions "taken separately and/or collectively, singularly and/or cumulatively, constitute a direct and proximate cause of [Romero's] death."  Id.  American Empire, Finger's insurance provider, tendered its defense to Crum and Crum declined.

The Court characterized the issue as whether Crum was obligated by the "whole or in part" sentence of the additional ensured endorsement to defend Finger in the underlying lawsuit. It held that the "'whole or in part' sentence focuses on whether Multi is partially or wholly responsible for the third party injuries and Finger's liability for same."  Id. at *7.  Furthermore, "[t]he focus of the definition of additional insured coverage in the 'whole or in part' sentence is on whether Plaintiffs allege a theory in the operative pleading in the Underlying Lawsuit under which Finger could be held liable for conduct by Multi that 'caused' injury to a third party in any way."  Id.  The Court concluded that Crum was liable to defend Finger because the plaintiffs in the underlying lawsuit potentially alleged a claim against Finger based on some conduct by Multi.  Id.

Similarly, in Gilbane Bldg. Co. v. Empire Steel Erectors, L.P., Civ. A. No. 08-1707, 2010 WL 707378 (S.D. Tex. Feb. 23, 2010), the Court was presented with virtually the same

_____

[4]        The opinion does not identify who employed Romero or Martinez.

additional insured language as in this case. There, the underlying plaintiff made no allegations in his complaint with respect to the named insured because the named insured was his employer and could not be held liable under the state workers' compensation laws.[5] Nevertheless, the Court found that the additional insured was entitled to a defense under the policy because it could not "say that [the underlying plaintiff] Parr himself, acting on behalf of [the named insured] Empire Steel in the course of his job, was not possibly a contributing, proximate cause of his injuries." Id. at *10. The Court noted that Parr pled that he was injured while working for Empire Steel, that the injury occurred while he was walking down a ladder with muddy boots and that these allegations "raise[d] at least an inference that Parr himself could have been partly at fault." Id. (citation omitted). Thus, even though the complaint did not allege Empire Steel's acts or omissions, the Court held that the duty to defend was triggered. Id.

---

[5]     One commentator cautions,

> The only allegations that would fall clearly outside the coverage provisions of the new additional insured endorsements, however, would be explicit allegations of the additional insured's sole fault. In most instances, insurers should look beyond the lawsuit to determine if the insured's acts or omissions may have contributed to the bodily injury, and whether they should defend and indemnify on behalf of the additional insured. A hard-line approach on this by insurers will likely result in a new line of coverage cases in which additional insureds are attempting to prove some degree of culpability against their subcontractors to obtain coverage under the subcontractors' CGL policies.

Jack P. Gibson & Jeff Woodward, 2004 ISO Additional Insured Endorsement Revisions, ABA Forum on the Construction Industry Winter Meeting (Jan. 27, 2005). The comments arise out of a concern that an injured worker may often fail to allege any wrongdoing on the part of his employer–because workers' compensation laws shield the employer from liability in the underlying suit. As a result, the insurer in the over-action would narrowly interpret the policy so as not to require coverage.

This case law and the drafter's history supports my conclusion that the additional insured provision requires a showing that Nesmith's acts or omissions were a proximate cause of Francis' injuries in order to trigger the policy coverage.

**2.    Cumberland Had A Duty To Defend Dale**

Cumberland admits Dale is an additional insured under the policy.  Def.'s Resp. (D. 29) at ¶ 5(a).  However, it denies, <u>inter alia</u>, that it had a duty to defend Dale in the underlying litigation.  I find that Cumberland had a duty to defend because Francis alleged a theory in the underlying litigation against Dale which was based on some conduct by Nesmith that caused, in whole or in part, Francis' injuries.  <u>See</u> <u>American Empire</u>, 2006 WL 1441854 at *7.  Specifically, Francis's second complaint named, among others, Nesmith as a defendant and alleged under Count III:

> 75.    Defendant Nesmith, being in control of and the possessor of the Genie lift at the construction site, had a duty of care to ensure that the Genie lift was not used in an unreasonably and/or unsafe manner.

> 76.    Defendant Nesmith was responsible for the actions of its agents, servants, workmen, and employees by way of vicarious liability and respondeat superior.

> 77.    The negligence, carelessness and/or recklessness of defendant Nesmith, by and through the conduct of its agents, servants, workmen and/or employees, consisted of the following:

> a.    Failing to secure the Genie lift so as to prevent unauthorized persons from using it at the job site;

> b.    Failing to secure the keys to the Genie lift so as to prevent unauthorized persons from using it at the job site;

> c.    Giving the keys to the Project Superintendent for the purpose of allowing other subcontractors at the job site to use

the Genie lift whenever convenient;

        d.     Permitting other subcontractors to use the Genie lift at the job site;

        e.     Permitting unauthorized persons to use the Genie lift in close proximity to live electrical wires;

        f.     Permitting other subcontractors to use the Genie lift at the job site without ensuring that they had the requisite knowledge and experience in using this type of device;

        g.     Permitting subcontractors such as Chisom's employees, who had little or inadequate training or experience with the Genie lift, to use the lift in close proximity to live electrical wires; and

        h.     Failing to supervise the use of the Genie lift by other subcontractors at the job site.

        78.     The negligent conduct of defendants proximately caused injuries and damages to plaintiff as described above.

Joint Stip. (D. 24) Exh. C. at ¶¶ 76-78. These allegations state a cause of action which may potentially fall within the scope of the policy's coverage. The complaint clearly alleges that Francis' injuries were proximately caused, at least in part, by any one of Nesmith's alleged acts or omissions which Nesmith performed as part of its ongoing operations for Dale.

Cumberland makes several arguments for why summary judgment on the issue of whether Cumberland had a duty to defend may not be granted in favor of Dale. First, it argues that as a matter of law Nesmith was not the proximate cause of the accident or, alternatively, that there remains a fact question as to whether Nesmith's conduct was the proximate cause of Francis' accident. Def.'s Resp. (D. 29) at 13-14. In making this argument, Cumberland asks me to look beyond the underlying complaint to the deposition testimony of Alton Ming wherein

Ming stated that he was the sole cause of the accident, or the deposition testimony of Craig Lynch, Dale's superintendent, who testified that he gave Ming and Francis the key to the lift.[6] However, as discussed supra, Francis' underlying complaint alleged that Nesmith was the proximate cause of his injuries and this was sufficient to trigger Cumberland's duty to defend.[7] Cumberland cites no authority that permits me to look beyond the complaint and the policy language to determine whether there was a duty to defend.

Similarly, Cumberland's argument that Dale's positions taken in its underlying summary judgment motion are dispositive of Nesmith's lack of liability is unavailing. Dale/Westrum's motion stated "[t]he actions of the employees of Robert Francis' employer, Chisom Electric . . . are the sole factual and proximate causes of the accident . . . . the moving defendants are entitled to summary judgment in their favor because it cannot be *genuinely* disputed that anything other than the actions of Chisom employees were the sole factual and proximate cause of the accident." Again, "[i]f the complaint against the insured avers facts that would support a recovery covered by the policy, then coverage is triggered and the insurer has a duty to defend until such time that the claim is confined to a recovery that the policy does not cover." General Acc. Ins. Co. of Am., 692 A.2d at 1095 (citations omitted). While Francis's amendment of the complaint to exclude his prior allegations concerning Nesmith or a dismissal of the claims by the court would have limited the claims in the underlying case, Dale's summary judgment motion certainly did not

_____

[6]     Cumberland also claims that the "PECO investigation" established that Nesmith did not cause Francis injuries. Def.'s Mot. (D. 23) at 4. Even if I could consider this evidence, Cumberland has not provided it.

[7]     As will be discussed infra, whether there were actually sufficient facts to establish Nesmith's potential liability and therefore trigger Cumberland's duty to indemnify is an entirely separate inquiry.

confine the claim to a recovery that the policy did not cover.[8]

Second, Cumberland argues that Dale does not meet all of the requirements to trigger coverage under the policy because Francis's activities (installing electrical wiring) were not a part of Nesmith's operations (carpentry work). Def.'s Resp. (D. 29) at ¶ 16. This argument focuses on the latter portion of the additional insured provision: Dale is an additional insured "only with respect to liability for 'bodily injury' . . . caused, in whole or in part, by: 1. Your [Nesmith's] acts or omissions; or 2. The acts or omissions of those acting on your [Nesmith's] behalf [] <u>in the performance of your [Nesmith's] ongoing operations for the additional insured [Dale]</u>." (emphasis added). There is no dispute that on the day of the accident Nesmith was performing its carpentry operations for Dale. <u>Id.</u> There is also no dispute that Nesmith obtained the lift and had it at the site for its use in furtherance of those operations. <u>Id.</u> at ¶ 17. Francis alleged in his second complaint that it was Nesmith's acts or omissions with respect to the lift which caused, at least in part, his injuries. Joint Stip. (D. 24) Ex. C. at ¶¶ 76-78. The plain language of the policy does not require that the injured party be engaged in Nesmith's operations. Such a reading would effectively limit Cumberland's liability only to injuries caused entirely by the acts or omissions of Nesmith's employees or agents. Rather, the policy language contemplates injuries partially caused by Nesmith in the performance of its operations, implying that the injury is partially caused by a party not involved in Nesmith's operations. Accordingly, I find Cumberland had a duty to defend Dale.

---

[8]    Cumberland apparently concedes that Dale is not prohibited from taking a contrary position in this case (<u>i.e.</u>, that Nesmith caused Francis's injuries) from what it took in the underlying case (<u>i.e.</u>, that Chisom's employees were the sole factual and proximate cause of the injuries). Def.'s Reply (D. 30) at 9.

### 3. When Cumberland's Duty to Defend Began

Cumberland argues that even if it had a duty to defend Dale, its duty did not arise until October 31, 2008 when Dale first tendered its defense. Francis filed his first suit against Dale–which did not name Nesmith as a defendant–in August 2006. Dale then filed a joinder complaint against Nesmith on April 17, 2007. Francis filed his second complaint in June 2007 which named, among others, Nesmith. The two actions were consolidated on September 27, 2007. Dale then filed a counterclaim against Nesmith in the consolidated action on November 13, 2007. Dale first tendered its defense to Nesmith and Cumberland on October 31, 2008.

While the Pennsylvania courts have not directly addressed when an insurer's duty to defend arises, I find persuasive the reasoning in <u>Rite Aid Corp. v. Liberty Mut. Fire Ins. Co.</u>, Civ. A. No. 03-1801, 2006 U.S. Dist. LEXIS 57094, at **15-19 (M.D. Pa. Aug. 14, 2006). In that case, Liberty Mutual objected to payment of any fees billed prior to Rite Aid's August 27, 2001 tender letter. The Court noted that "[u]nder Pennsylvania law, where an insured provides an insurer late notice of a potential claim, the insurance company will be relieved of its obligations under the policy only if it can prove actual prejudice resulting from the untimely notice." <u>Id.</u> at **15-16 (<u>citing</u> <u>Safeguard Scientifics, Inc. v. Liberty Mut. Ins. Co.</u>, 961 F.2d 209 (3d Cir. 1992) (table) (reversing the District Court's holding that pre-tender attorney's fees incurred by an insured are not recoverable when the insurer has not demonstrated prejudice); <u>Trustees of the Univ. of Pa. v. Lexington Ins. Co.</u>, 815 F.2d 890, 896 (3d Cir. 1987); <u>Brakeman v. Potomac Ins. Co.</u>, 371 A.2d 193, 195-99 (Pa. 1977)). As the Pennsylvania Supreme Court explained in <u>Brakeman</u>:

> In short, the function of a notice requirement is to protect the

> insurance company's interests from being prejudiced. Where the insurance company's interests have not been harmed by a late notice, even in the absence of extenuating circumstances to excuse the tardiness, the reason behind the notice condition in the policy is lacking, and it follows neither logic nor fairness to relieve the insurance company of its obligations under the policy in such a situation.

371 A.2d at 197.  Additionally, the Rite Aid court found persuasive the Tenth Circuit Court of

Appeals's analysis in TPLC, Inc. v. United Nat'l Ins. Co., 44 F.3d 1484, 1491-1493 (10th Cir.

1995), a case applying Pennsylvania law and which also relied upon Brakeman to reject the

argument that "the insurer can avoid the obligation to reimburse the insured for defense costs

incurred prior to receipt of notice."  The Tenth Circuit held that "in the absence of a showing of

prejudice, the insurer's duty to defend includes the duty to reimburse for reasonable costs of

defense incurred prior to notice, as well as for subsequent defense costs."  Id. at 1493.

     Cumberland appears to reject the applicability of Brakeman to this case because it argues

that by the time Dale tendered its defense Cumberland was able to review the facts developed to

date and make a "good faith" determination that Francis's injuries were not covered under the

policy.  Def.'s Reply (D. 30) at 11.  Cumberland does not contend that it was prejudiced by the

timing of Dale's notice, but argues merely that it would be "inequitable" to hold it responsible for

the costs incurred by Dale prior to Dale's tender.  Id.  It may be true that Cumberland's

determination that the policy did not cover Dale's claim was made in "good faith," however

"[a]n insurer who refuses to defend a claim potentially within the scope of the policy does so at

its own peril" if it is later determined that such duty existed.  Chestnut Hill Academy v. Graphic

Arts Mut. Ins. Co., Civ. A. No. 04-1560, 2005 WL 1715660, at *4 (E.D. Pa. July 24, 2005)

(citing Ripepi v. Am. Ins. Cos., 349 F.2d 300, 303 (3d Cir. 1965)).  Therefore, I find that because

Cumberland has not shown any prejudice arising from Dale's late notice its duty to defend arose prior to Dale's tender of notice on October 31, 2008.

Dale seeks a declaration that Cumberland has an obligation to defend and reimburse for defense costs, including attorneys fees, that Dale incurred as a result of both the first suit and the second consolidated action. Pl.'s Mot. (D. 25) at 1-2. Thus, it essentially asks me to find that Cumberland's duty to defend began in August 2006 when Francis filed his first suit. As the parties have not addressed in their motions or memoranda when Cumberland's duty was triggered–e.g., if it was when Francis filed his first suit in August 2006, when Dale filed its joinder complaint[9], when Francis filed his second suit in June 2007, or at some other time–I will reserve ruling on this issue until the parties have submitted additional briefing.

### 4. Cumberland's Duty to Defend Did Not End

As stated supra, "[t]he duty to defend remains with the insurer until the insurer can confine the claim to a recovery that is not within the scope of the policy." Pac. Indem. Co., 766 F.2d at 760 (internal citations omitted). Cumberland argues in the alternative that even if it had a duty to defend, that duty ended when Alton Ming testified in his deposition on May 29, 2007 that he was responsible for Francis' injuries. It cites Bombar v. West Am. Ins. Co., 932 A.2d 78, 87 (Pa. Super. Ct. 2007), for the proposition that Cumberland's duty ended when Cumberland reasonably determined that the claim was not covered by the policy. Defendant misstates the holding of that opinion. Bombar accurately stated the law regarding the duty to defend:

> In the event that the complaint alleges a cause of action which may

---

[9] Although the parties' Joint Stipulation states that the joinder complaint was filed by Dale on April 17, 2007, the certificate of service dates the document to January 30, 2007. Joint Stip. (D. 24) Exh. B.

> fall within the coverage of the policy, the insurer is obligated to
> defend . . . . The duty to defend exists until such time when it is
> determined that the claim is confined to a recovery that the policy
> does not cover.

Bombar, 932 A.2d at 87 (quoting Unionamerica Ins. Co. v. J.B. Johnson, 806 A.2d 431, 433-434

(Pa. Super. Ct. 2002)).  That Court went on to affirm the trial Court's grant of summary judgment

in favor of the plaintiff on her claims against the insurer for breach of its duty to defend and

indemnify.  Just as Ming's testimony cannot establish that Cumberland had no duty to defend as

discussed supra, Ming's testimony cannot terminate that duty.  The withdrawal or dismissal of

the claim or of Nesmith or Dale as defendants would clearly establish that Cumberland no longer

had a duty to defend.  See Meridian Mut. Ins. Co. v. James Gilligan Builders, Civ. A. No.

08-1995, 2009 WL 1704474, at *2 (E.D. Pa. June 18, 2009) ("A duty to defend continues so long

as the complaint alleges a cause of action that potentially falls within the coverage provision of

the insurance contract.  The obligation ceases, however, if the cause of action upon which the

duty to defend exists is dismissed.") (citing Bombar, 932 A.2d at 86-87).   Similarly, a finding

that Cumberland has no duty to indemnify, as discussed infra, is sufficient to terminate

Cumberland's duty to defend.  However, Ming's testimony cannot suffice to extinguish the

allegations in the complaint which gave rise to Cumberland's duty to defend.

### C.    Duty to Indemnify

The duty to indemnify is entirely distinct from the duty to defend.  Frog, Switch & Mfg.

Co. v. Travelers Ins. Co., 193 F.3d 742, 746 (3d Cir. 1999) ("An insurer's duty to defend an

insured in litigation is broader than the duty to indemnify, in that the former duty arises whenever

an underlying complaint may 'potentially' come within the insurance coverage.").  "Unlike the

duty to defend, the duty to indemnify cannot be determined merely on the basis of whether the factual allegations of the complaint potentially state a claim against the insured." Am. States Ins. Co. v. State Auto Ins. Co., 721 A.2d 56, 63 (Pa. Super. Ct. 1998). As this Court has stated, under Pennsylvania law, "[t]he duty to defend arises whenever claims asserted by the injured party potentially come within the coverage of the policy, while the duty to indemnify arises only when the insured is determined to be liable for damages within the coverage of the policy." Britamco Underwriters, Inc. v. Stokes, 881 F. Supp. 196, 198 (E.D. Pa. 1995).

There are two prongs to determining whether an insurer has a duty to indemnify when the insured settles the underlying litigation. First, "[a]n insurer has a duty to indemnify its insured only if it is established that the insured's damages are actually within the policy coverage." Lang Tendons, Inc. v. Northern Ins. Co. of New York, Civ. A. No. 00-2030, 2001 WL 228920, at *11 (E.D. Pa. Mar. 7, 2001) (citations omitted); Safeguard Scientifics, Inc. v. Liberty Mut. Ins. Co., 766 F. Supp. 324, 334 (E.D. Pa. 1991) (citations omitted), rev'd on other grounds Safeguard Scientifics, 961 F.2d 209. When an insured settles the underlying action and only some claims are covered under the policy, it has the burden of showing how the settlement amount should be equitably apportioned. Safeguard Scientifics, 766 F. Supp. at 334 (citing Cooper Labs., Inc. v. Int'l Surplus Lines Ins. Co., 802 F.2d 667, 674 (3d Cir. 1986) (applying New Jersey law)). There is no "blanket rule" that when an underlying lawsuit settles the insurer has an automatic duty to indemnify. Regis Ins. Co. v. All Am. Rathskeller, Inc., 976 A.2d 1157, 1161 n.8 (Pa. Super. Ct. 2009) (citing Am. States Ins. Co., 721 A.2d 56).

Second, the underlying settlement must be reasonable. When an insurer fails to exercise its duty to defend on behalf of its insured, the insured may "properly negotiate a settlement in an

amount that [is] fair and reasonable." Alfiero v. Berks Mut. Leasing Co., 500 A.2d 169, 171-172 (Pa. Super. Ct. 1985). An insured properly negotiates a settlement if "it was done in good faith and the settlement was fair and reasonable." Id. at 172; see also TIG Ins. Co. v. Nobel Learning Communities, Inc., Civ. A. No. 01-4708, 2002 WL 1340332, at *12 (E.D. Pa. June 18, 2002).

Here, Cumberland had a duty to defend Dale and refused to do so. Dale tendered its defense first via a letter dated October 31, 2008 and a second dated November 4, 2008. Cumberland declined Dale's requests for a defense in a response letter dated November 11, 2008 on the grounds that the underlying claim was outside the scope of the policy coverage. It is undisputed that Cumberland did not participate in the second mediation on behalf of Dale.[10] In essence, Cumberland has a duty to indemnify Dale if: 1) Dale can establish that its damages are actually within the policy coverage, and 2) the settlement was done in good faith and was fair and reasonable. See Lang Tendons, 2001 WL 228920, at *11; Alfiero, 500 A.2d at 172.

1.      The Negligence Action Against Nesmith

Dale's damages were within the policy coverage if the settlement was for claims covered by the policy. As discussed supra, the negligence claim alleged against Nesmith triggered Cumberland's duty to defend Dale as an additional insured. "When an insurer refuses to defend and an insured settles, '[i]n order to recover the amount of the settlement from the insurer, the insured need not establish actual liability to the party with whom it has settled so long as a potential liability on the facts known to the insured is shown to exist, culminating in a settlement

---

[10]      There is no evidence that Cumberland was aware of or invited to participate in the first mediation held on October 16, 2008. Dale requested that Nesmith, Cumberland's insured, participate in the second mediation held on March 17, 2009. Nesmith consented. It is unclear whether Cumberland participated in the second mediation on behalf of Nesmith.

in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the insured.'" TIG, 2002 WL 1340332, at *12 (quoting Am. Int'l, 771 F. Supp. at 702). Thus, I must first determine whether the negligence claim alleged against Nesmith triggers the duty to indemnify. As discussed supra, the phrase "caused, in whole or in part, by" requires that Nesmith be the proximate cause of Francis's injuries in order to trigger Cumberland's duty. However, I need only find that Nesmith was "potentially" a proximate cause of Francis's injuries as the facts were known to Dale at the time of the settlement in order for Cumberland to be liable to indemnify Dale for the settlement costs. Id.

Cumberland's primary argument in support of its position that Nesmith was not proximately liable is that either Ming or Craig Lynch, Dale's superintendent who Francis testified gave Ming the keys, caused the accident. Def.'s Reply (D. 30) at 7-8. Even if Ming or Lynch were a cause of the accident, this fact alone would not prevent Nesmith from also being a concurring and proximate cause. However, as Cumberland argues, Ming's conduct may terminate Nesmith's liability if he were a superceding cause of the accident which was not reasonably foreseeable by Nesmith. Id. at *8-9 (citing Powell v. Drumheller, 653 A.2d 619, 623 (Pa. 1995)).

This Court recently summarized Pennsylvania law concerning proximate causation and superseding causes:

> "Proximate cause is a term of art, and may be established by evidence that a defendant's negligent act or failure to act was a substantial factor in bringing about the harm inflicted upon a plaintiff." Powell [653 A.2d at 622]. A defendant is not relieved from liability because another concurring cause is also responsible for producing the injury. Id. Likewise, an intervening cause is merely one that arises after the negligence of the defendant, and does not relieve the defendant of

liability unless it supercedes the defendant's negligent conduct by rendering it too remote from the plaintiff's injuries. <u>Vattimo v. Lower Bucks Hosp., Inc.</u>, 465 A.2d 1231, 1237 n. 4 (Pa. 1983).

The test to determine whether an intervening force supercedes antecedent negligent conduct is whether "the intervening conduct was so extraordinary as not to have been reasonably foreseeable." <u>Powell</u>, 653 A.2d at 623.

. . . .

The law does not operate to relieve a defendant from his liability where a concurring cause is easily anticipated. <u>Powell</u>, 653 A.2d at 622 ("[w]here the jury could reasonably believe that a defendant's actions were a substantial factor in bringing about the harm, the fact that there is a concurring cause does not relieve the defendant of liability.").

<u>St. Paul Fire & Marine Ins. Co. v. Nolen Group, Inc.</u>, Civ. A. No. 02-8601, 2007 U.S. Dist. LEXIS 64603, at *33-36 (E.D. Pa. Aug. 31, 2007). "The issue of proximate cause is almost always one of fact for the jury; where there is no dispute as to the facts, the issue is then one of law for the court." <u>Farley v. Sley Sys. Garages, Inc.</u>, 144 A.2d 600, 602 (Pa. Super. Ct. 1958) (<u>citing</u> <u>De Luca v. Manchester Laundry and Dry Cleaning Co., Inc.</u>, 112 A.2d 372 (Pa. 1955)).

Pennsylvania courts have had several occasions to consider whether a plaintiff's injuries were proximately caused by the unauthorized driver of a vehicle or whether those acts were not reasonably foreseeable. In these negligence actions, the courts have held that the defendants (parking garages, car dealerships, pizza delivery car drivers and others) were not liable to the injured plaintiffs (including innocent bystanders, or like here, the unauthorized users of the vehicles) on the grounds that, as a matter of law, the plaintiffs failed adequately to plead or establish proximate causation. Thus, when the defendants did not know and should not have known that the vehicle might be stolen by an incompetent driver and that the stolen vehicle

would be driven in a reckless manner, the defendants could not be the proximate cause of the plaintiffs' injuries.  See Matos v. Rivera, 648 A.2d 337, 340 (Pa. Super. Ct. 1994); Liney v. Chestnut Motors, Inc., 218 A.2d 336, 338 (Pa. 1966) ("nothing existed in the present case to put [the defendant] on notice that the thief would be an incompetent or careless driver."); Jamison v. City of Philadelphia, 513 A.2d 479, 481-82 (Pa. Super. Ct. 1986) ("appellant's complaint did not contain averments of fact sufficient to permit a finding that Blara either knew or should have known that the vehicle was likely to be stolen by an incompetent driver or that the thief would drive the vehicle in a negligent or reckless manner. . . . The thief's careless operation of the stolen vehicle was a superseding cause of appellant's injuries, for which appellee cannot be held liable."); see also Farley, 144 A.2d 600.

In order for Dale to be entitled to indemnification, Dale need not establish that Nesmith was the actual proximate cause of Francis's injuries.  Dale must only show that there was a potential liability on the facts known to it at the time it settled.  Thus, I must analyze the facts as they were known by Dale at the time it settled the underlying lawsuit and ask whether there were facts that created potential liability, i.e. could Nesmith have been viewed as the proximate cause of the accident?  As a matter of law, I find Nesmith was not and could not potentially have been a proximate cause of the accident based upon the facts known to Dale at the time of settlement.  Accordingly, I will deny Dale's motion and grant Cumberland's motion and declare that Cumberland has no duty to indemnify Dale for the amount it incurred in settling the underlying litigation.

The first prong for showing proximate cause requires the intervening conduct to have been reasonably foreseeable.  Powell, 653 A.2d at 623.  Here this means the intervening conduct

of Ming and Francis must have been reasonably foreseeable to Nesmith. It is undisputed that the lift was a part of Nesmith's equipment and present on the job site for its exclusive use. Pl.'s Mot. (D. 25) at 9 (citing, Joint Stip. (D. 24-7) Ex. O (dep. J. Russell, Nesmith's foreman) at 17, 21, 29-30); see also Pl.'s Reply (D. 31) at 5 ("the lift was brought to the site by Nesmith for Nesmith's exclusive use"). There is no disputed issue of material fact that Nesmith did not give anyone permission to use the lift. See Joint Stip. (D 24) Ex. O (dep. J. Russell) at 21-22.[11] Furthermore, Dale's superintendent, Michael Lynch, testified that it was common practice on a construction site that one trade would not use the equipment owned by another trade without getting permission from the trade that owned the equipment. Joint Stip. (D. 24-5) Ex. M (dep. of M. Lynch) at 92.[12] Therefore, I find that Ming and Francis's conduct was not reasonably foreseeable to Nesmith because Nesmith did not know and should not have known that the lift would be used without its permission.

Dale argues Nesmith failed to prevent access to the lift and that this omission had a causal connection to Francis's injuries. Pl.'s Resp. (D. 28) at 8. Nesmith's omission of securing the

---

[11] Ming testified that after his arrival at the job site on June 21, 2005, he asked for the superintendent and was directed to a trailer. Inside a man identified himself as superintendent and while he directed Ming to use the lift to complete his electrical work, see Joint Stip. (D. 24-3) Ex. K (dep. A. Ming) at 63-65, Dale has presented no evidence that Nesmith gave the superintendent permission to allow others to use the lift and agrees that the lift was solely for Nesmith's use. See Pl.'s Mot. (D. 25) at 9.

[12] Ming testified that he believed that other contractors had been using the lift on the job site but was not sure. Joint Stip. (D. 24-3) Ex. K (dep. A. Ming) at 107-108. Ming also testified that in his experience it was common for contractors to share lifts on job sites as long as they asked permission and knew how to operate the lifts. Id. at 108. While Ming's testimony contradicts Lynch's testimony, it remains undisputed that Nesmith had not given any other trade permission to use the lift.

key or the lift from use with a skeleton key[13] is not a proximate cause of Francis's injuries because the actions of Ming or Francis in taking the lift without Nesmith's permission were not reasonably foreseeable to Nesmith. Indeed, why would Nesmith attempt to prevent access to the lift if it knew that the lift was on the site only for its purposes and it had not given permission to any other trade to use the lift?

Furthermore, even if it was reasonably foreseeable to Nesmith that someone would use the lift, there was no reason for Dale to believe at the time it settled that Nesmith knew or should have known that electricians trained to use a lift would use it in a careless manner. Cf. Anderson v. Bushong Pontiac Co., 171 A. 2d 771 (1961) (holding that defendant was clearly on notice not only that the automobile was likely to be stolen, but also that it was likely to be stolen by an incompetent driver when defendant knew keys to have been stolen by a 14-year-old boy); Glass v. Freeman, 430 Pa. 21, 27 (Pa. 1968) (holding that since it was foreseeable that the 7-year-old boy might attempt to drive the tractor, it also was foreseeable that he would drive it negligently). Here, Ming and Francis knew how to use the lift. Joint Stip. (D. 24) Ex. K (dep. of A. Ming) at 112. Ming was in charge of his own and Francis' safety on the day of the accident and he knew to avoid any possible electrical hazard by at least ten feet or to investigate whether the wires were carrying electricity. Id. at 43-46. He failed to do either of those things on the day of the accident and instead knowingly worked too close to the PECO power lines. Id. at 45-46. Ming's willful violation of commonly recognized safety practices and standards warning of electrocution hazards was the "primary contributing cause of the subject accident." Joint Stip.

---

[13]     One expert concluded that a skeleton key could have been used to start the lift. See, Joint Stip. (D. 24-9) Ex. S at 6.

(D. 24-9) Ex. R (Expert Rep. of S. Pultz) at 14.[14]  As a result, there was no way for Nesmith to

anticipate the careless use of its lift by these two trained electricians.[15]  Therefore, Dale's motion

for a declaration that it is entitled to indemnification and, consequently, the declaration that the

settlement was reasonable will be denied and Cumberland's motion for judgment in its favor that

it owes no duty to indemnify Dale will be granted.

### 2.     The Negligence Action Against Dale

The underlying plaintiffs also sued Dale directly for its "negligence, carelessness and/or

recklessness," Joint Stip. (D. 24) Ex. A at ¶¶ 26-32, 55-58, and for its vicarious liability, id. at ¶¶

50-54; Ex. C at ¶¶ 61-66.  In Cooper Labs., the Court of Appeals held that when an insured's

"liability rests on two bases–one which is within the policy and one with out–then an equitable

apportionment between the two grounds must be made" and this factual question must be

addressed before coverage can be determined.  802 F.2d at 674; see also 12th Street Gym, Inc. v.

Gen. Star Indem. Co., 93 F.3d 1158, 1167 (3d Cir. 1996) (affirming District Court's denial of

insureds' motion for summary judgment where insureds settled underlying action before claims

were confined to those outside of policy's scope).  At this stage, the burden is on Dale to prove

how much of the settlement was directed at its liability, as these would not be covered damages

under the policy.  In this respect, I have not been presented with any evidence as to what portion

of the settlement damages paid out by Dale were actually covered by the policy.  Nor is there any

---

[14]     Dale's expert concluded that there was nothing that would have alerted Dale
regarding the reckless and unsafe behavior of Ming.  Id. at 12.  Certainly if there was nothing to
alert Dale of Ming's behavior, there was nothing to alert Nesmith of this behavior either.

[15]     I note this outcome would be different if a minor or an untrained worker on the
site had used the lift carelessly as it would be foreseeable to Nesmith that such a user could be
injured.

evidence regarding the intent of the underlying plaintiffs with regard to their decision to settle. Thus, Dale's motion for summary judgment on the matter of indemnification is denied on this additional ground.  See Lang Tendons, 2001 WL 228920, at *11 (citing 12th Street Gym, Inc., 93 F.3d at 1167).

      An appropriate Order follows.